GARVIN MACH. CO. v. HAMMOND TYPEWRITER CO.

(Supreme Court, Appellate Division, First Department. December 11, 1896.)

PAROL EVIDENCE—AMBIGUOUS CONTRACT.

A contract to manufacture typewriting machines equal to a "complete model machine" to be furnished to the manufacturer, but which does not indicate what the parties intended the model machine to be, is ambiguous as to whether or not two interchangeable typewheels are requisite to a complete machine; and evidence outside the contract, to show the intent of the parties, is admissible.

Appeal from judgment on report of referee.

Action by the Garvin Machine Company against the Hammond Typewriter Company for work and materials furnished in the manufacture of certain machines for defendant by the firm of E. E. Garvin & Co., which assigned the claim to plaintiff. From an affirmative judgment in favor of defendant, entered in the office of the clerk of the county of New York on the report of a referee, plaintiff appeals. Affirmed.

The action is brought by the plaintiff, as assignee of the firm of E. E. Garvin & Co., to recover various sums of money for work done for and materials furnished to the defendant. Both plaintiff and defendant are domestic corporations. The answer denied many of the allegations of the complaint as to the work and materials, and their value, and set up payment of many of the items claimed, and counterclaims for overcharges by the firm of Garvin & Co., and failure by them to fulfill the obligations subsisting on their part towards the defendant. The referee found that the plaintiff had made out a cause of action for the sum of $234,172.82; but that the defendant was entitled to a credit of $234,652.63. He gave a judgment for the defendant for the excess, and dismissing the complaint. Among the items of the plaintiff's claim was one for $23,297.10 for 8,335 typewheels furnished to the defendant. The latter claimed that the price of 5,093 of these wheels was included in the price of certain typewriting machines made by the firm of Garvin & Co. for the defendant under a contract executed on November 12, 1884. By this contract the firm of Garvin & Co. agreed to manufacture for the defendant "five thousand Hammond typewriter machines, equal to the complete model machine to be furnished by the said party of the second part [the defendant]." The plaintiff claimed that but one typewheel was to be furnished with each machine; the defendant, that two went with each of them under the contract. The referee found in favor of the defendant on this issue, and did not allow the plaintiff for the typewheels delivered with the machines provided for

by the contract, and certain others, in excess of the contract number, but delivered and received under its terms.

So much of the opinion of Theron G. Strong, Esq., referee, as relates to the questions considered by the court, is as follows:

"The contract in question required the firm of E. E. Garvin & Co. to manufacture typewriters at a stipulated price, equal to the complete model machine to be furnished by the defendant, and to deliver the same as its necessities might require, of whose requirements due and reasonable notice was to be given; and that any change that might be agreed upon by the parties in the construction of said typewriters should be made and charged at actual cost. And it was further agreed to keep in good repair certain machinery and small tools, and return the same to the defendant upon the termination of the contract in as good condition, reasonable wear and tear excepted.

"The first question under the contract arises on a charge for 8,335 typewheels, at $23,297.10. The plaintiff contends that all of the wheels charged for were outside the contract. The defendant admits that 3,242 were outside the contract, and contends that the remaining 5,093 were embraced within it. The controversy in this respect is due to the plaintiff's claim that only one wheel went with each machine, while the defendant contends that two wheels went with the same. The contract is not clear in this respect. It provides for the manufacture and delivery of machines equal to the complete model machine to be furnished; but it does not indicate what the parties intended this complete model machine to be. The contract is dated November, 1884, and the plaintiffs entered immediately upon its performance, and commenced the delivery of machines. Between the date of the contract and the 11th of February, 1885, plaintiffs delivered twelve machines. It was not until this latter date that the model machine was furnished. If it were established with exactness what the condition was, of the machine delivered as the model, at the time of delivery, with respect to the number of wheels, there would be little difficulty in arriving at a conclusion; but, in the absence of this proof, it is necessary to consider what the parties to the contract intended by the term 'complete model machine.' To ascertain this intention, resort has been had to proof of surrounding circumstances, including the acts of the parties. Bagley & Sewall Co. v. Saranac River Pulp & Paper Co., 135 N. Y. 626, 32 N. E. 132; Schmittler v. Semon, 114 N. Y. 176, 21 N. E. 162; Dodge v. Zimmer, 110 N. Y. 43, 17 N. E. 399; Griffiths v. Hardenbergh. 41 N. Y. 464. In connection with this proof there is to be considered the probabilities of the case. The evidence establishes that the contracting parties thoroughly understood what they meant by the term 'complete model machine.' The contract was negotiated by Hugh R. Garvin and James B. Hammond. They were on rather more than friendly, if not on intimate, terms. The subject of the manufacture by Garvin of typewriting machines for the defendant had been a matter of much discussion between them, not only in New York, but during various pleasure trips which they took together. The defendant was then engaged in the sale of typewriting machines, and had issued business circulars offering the Hammond typewriter on the terms, 'Price, including one extra wheel, $100;' and Mr. Garvin in fact, on May 31, 1884,—nearly six months before the contract,—had purchased a machine from the defendant for $100, which presumably, according to the announcement of the defendant's circulars, included an extra wheel. Furthermore, during the progress of said negotiations, the defendant delivered to the Garvins a typewriting machine on which to base an estimate, and the latter actually commenced manufacturing and delivering typewriting machines with two wheels, and continued to do so for over two months before the complete model machine was furnished. It is clear from these facts that the parties themselves thoroughly understood whether the complete model machine embraced one wheel or two. The question to be answered, then, is this: Did the parties intend that the complete model machine should be a machine with two typewheels? The great feature of the Hammond typewriter is its-interchangeable typewheels. Unlike type bar machines, admitting of the use of but a single style of type, the Hammond machine, by its system of interchangeable typewheels, admits of the use by one machine of different styles of type by a very simple mode of removing and adjusting typewheels. It seems to me highly improbable that with this distinguish-

ing feature the defendant could have failed to offer more than one wheel with the machine as an inducement to the public to purchase, and it appears in fact that the defendant did offer two typewheels with each machine. This, taken in connection with the course of business of the defendant, as expressed in its circulars, and the fact that Mr. Garvin was supplied with a machine which, it seems to me, is at least probable had two wheels, renders it incomprehensible that the parties should have omitted in their negotiations and in their contract to provide for a second wheel with each machine, and have excluded the second wheel from the contract, to be the subject of an extra charge. It would, indeed, be strange if Mr. Hammond, knowing that each sale of a machine embraced two typewheels, intended to contract for machines with only one wheel; and, on the other hand, that Mr. Garvin, knowing that the course of business of the defendant was to furnish two wheels with each machine, supposed the contract related to machines with only one wheel.

"The lapse of time since the contract was made and the first statement rendered, impairs the value of testimony based on mere recollection. But the acts of the parties at the time are entitled to great weight in the solution of the question. Deliveries of machines, as has been stated, commenced immediately after the execution of the contract; and between that event and the furnishing of the complete model machine fourteen typewriters were delivered. All of these, except two, were delivered with two wheels. No special order for the extra wheel is proved in connection with these fourteen machines, and, in the absence of such evidence, the question naturally arises why any of them should have been delivered with two wheels, when, if the plaintiff's contention is correct, they would have been complete if delivered with only one. Mr. McClatchy, a witness for the plaintiffs, who occupied a position of responsibility and authority at the shop, and who was responsible for keeping accurate account of the completion and delivery of the machines, gives very pertinent testimony upon this subject. Mr. McClatchy's candor and evident truthfulness is a justification for placing great reliance upon his statements. He testifies that it was his understanding at the outset that two wheels went with each machine. This impression was derived from his intercourse with Mr. Rogers, who was the inspector for the defendant; so that the acts of both these important employés is directly in the line of the defendant's contention. Then, too, Mr. McClatchy, in formulating a book of record of the deliveries of the machines for the purpose of tracing them accurately, provided in this book, in separate columns, the date when the machine was finished and accepted, the number of the machine, and under the heading of 'Typewheels,' two columns,—one for the first, and the other for the second wheels. It is not directly proved that either of the Garvins knew of the preparation of this book; but it is difficult to believe that in the supervision which an employer would naturally exercise in the affairs of his business, this record, which was the main reliance for ascertaining the history of each machine, would not have been known to them. Mr. McClatchy also testifies that he first heard of the intention on the part of the Garvins to charge for the second wheel about December 15, 1885, and that this intention was for the first time expressed by Eugene E. Garvin, who then told Mr. McClatchy that he intended to charge for the second wheel. Up to that time it is evident that no such intention, if it had been formed, had ever been expressed to Mr. McClatchy, and that when the charge was made it was at once met with a protest from Mr. Hammond, and the statement that, if such charges were to be made, he would have to make another contract with somebody else. This conversation Mr. McClatchy reported to Mr. Garvin. Furthermore, as a significant act entitled to consideration in this connection is the sale to the Garvins from the Hammond Company, before the contract was made, of a machine which, if sold upon the usual terms proclaimed in the circulars (and there is no evidence that it was not so sold), was a machine with two wheels. It also appears that one, at least, of the estimates made, upon which the contract was based, was for a machine with two wheels. There is considerable additional testimony bearing upon this subject, resting in recollection only; but, without referring to it in particular, it is sufficient to say that, reading it in connection with the circumstances to which I have already adverted, the preponderance of evidence, in my opinion, establishes that it was the intention of the parties to the contract that the complete model machine to be furnished by the defendants was a machine with two wheels."

Argued before BARRETT, RUMSEY, WILLIAMS, O'BRIEN, and INGRAHAM, JJ.

Frederic R. Kellogg and Frederick Seymour, for appellant.

R. D. Benedict, for respondent.

BARRETT, J.   The substantial question in this case is whether the contract called for two typewheels as a part of each of the typewriting machines to be manufactured and delivered thereunder. The contract reads that the plaintiff's predecessors agree to manufacture for the defendant 5,000 Hammond typewriter machines "equal to the complete model machine" to be subsequently furnished. This complete model machine was to be so furnished by the defendant to the plaintiff's predecessors.   The plaintiff contends that this language is unambiguous, and that the machine was complete with but one typewheel.   The defendant, on the other hand, claims that the contract fails to define the elements of a complete machine, and they insist that it was the understanding of the parties that a complete machine was a machine with two typewheels.   The learned referee took the latter view of the case; we think correctly.   What should go with a typewriting machine to make it complete was not specified in the contract.   It was, therefore, competent to resort to the surrounding circumstances and the acts of the parties to get at what they both understood to be a complete machine, and what they meant by this expression as it was used in the contract.   The question was an open one, on the face of the instrument, whether a second typewheel was an appurtenant to a complete machine, or an addition thereto.   It does not settle the question to say that a machine with but one typewheel is complete in a material sense.   The second wheel may not be physically attached to the machine, and yet, in a trade sense, it may be part of it.   The question is, what did the parties understand to be a complete machine?  What, in other words, did the one party understand that he was to give, the other that he was to receive?   When that is made clear by the surroundings, the contract is made clear.   We think, therefore, that the evidence to which in general the appellant objects was properly admitted.   The findings thereupon—that the contract called for the second typewheel to be delivered with each machine—are amply supported by the evidence.   We can add nothing to the opinion of the referee upon this head.   He points out clearly and in detail the considerations which led him to make the finding in question.   We might add still other considerations pointing unerringly in the same direction; but this is unnecessary.   Suffice it to say that, upon a full review of all the evidence, we think no other conclusion could possibly have been arrived at than that both parties clearly understood that the complete machine referred to in the contract was a machine with the appurtenances of two typewheels.

It remains to consider one or two questions as to the admission of evidence.   The referee permitted the president of the defendant corporation to testify that in the course of his negotiations with Mr. Hugh Garvin, deceased, it was repeatedly stated that the ma-

chine had two wheels. This was objected to "as a communication that is not allowed under the provisions of the Code with respect to deceased parties (section 829)." We think this testimony was admissible under the particular circumstances of the case. Mr. Eugene Garvin, who was a son of Mr. Hugh Garvin, and a party in interest, deriving that interest from his father, was called as a witness for the plaintiff. He thereupon testified that he was present at the time the contract was signed, and was also present sometimes during the prior negotiations between his father and Mr. Hammond; and that upon all those occasions nothing was said in respect to the number of typewheels. The referee held, and we think properly, that, as Mr. Eugene Garvin had thus been examined in relation to this personal transaction or communication between Mr. Hugh Garvin and Mr. Hammond, the latter could also be examined upon the same subject. If the plaintiff desired to confine Mr. Hammond's examination to the precise occasions referred to by Mr. Eugene Garvin, it should have made a special point on that head, and asked that it be so limited. And in that connection it should have made it clear what Mr. Eugene Garvin intended to convey when he said that he was "sometimes" present during the prior negotiations. The question now sought to be raised would then have been properly presented,—a question as to which we express no opinion. We think, however, that Mr. Hammond's testimony should have been limited to the general transaction or communications as to which Mr. Eugene Garvin had been interrogated; that is, the transaction or communications prior to the signing of the contract. But, upon a review of the evidence, we are satisfied that while, at this point, the rule was possibly infringed, the plaintiff was not prejudiced. In fact, eliminating from the case all of Mr. Hammond's testimony with regard to his personal communications with Mr. Hugh Garvin, the weight of evidence is yet overwhelmingly in favor of the defendant's view of the contract. What the appellant mainly complains of in this testimony is Mr. Hammond's emphatic protest against the extra charge which the plaintiff made for the second typewheel. This was after the contract was made, and the plaintiff consequently insists that, even if Mr. Eugene Garvin's previous testimony opened the door to communications had prior thereto, the question of the subsequent charge was a new subject of communication, as to which the rule stated applied. Apart from the clear absence of prejudice, as already suggested, we find that Mr. Hammond's protest against the extra charge was made by Mr. Hugh Garvin's superintendent, McClatchy, and was by the latter conveyed to his principal. This is McClatchy's testimony upon the point:

"Q. Up to that time you had no idea that the second typewheel was going to be charged for at all? (Objected to as irrelevant. Objection overruled. Plaintiff excepts.) A. I did not. When that bill was presented, I think Mr. James Hammond was in Europe, and not at home. After he came back, he spoke to me about that bill. Q. Don't you remember that in that conversation Mr. Hammond insisted that that charge for an extra typewheel was not proper, in substance? (Objected to as improper, irrelevant, and incompetent, and governing the terms of a written contract. Objection overruled. Plaintiff excepts.) A. I think he may have said so. Q. But don't you remember that he did? A. I know he spoke

about the charges being extortionate, and I think he spoke of the second wheel. Q. As being one of those that were extortionate? A. Yes, sir."

McClatchy's testimony to the effect that he communicated this to. Mr. Hugh Garvin is as follows:

"Q. After you had this conversation with Mr. Hammond, did you not have a talk with Mr. Garvin about the matter? A. The late Mr. Garvin? Q. Yes; I mean the late Mr. Garvin. (Objected to as incompetent and immaterial, and also as relating to communications between the witness and a party deceased. Objection overruled. Exception by plaintiff.) A. Yes, sir. Q. You did have a conversation with him? A. Yes, sir. Q. What was that conversation? A. I told him of Mr. Hammond coming into my room, and speaking of the bill,—what we have talked over here,—and told him all about what Mr. Hammond had told me. Q. Told him what you told Mr. Hammond also? A. I don't know what I said to Mr. Garvin. I don't remember. Q. Don't you remember that you repeated the conversation as well as you remember it? A. Yes, sir."

It thus appears that Mr. Hugh Garvin was fully apprised of Mr. Hammond's protest, and the latter's testimony upon that head was simply cumulative. Such testimony, therefore, could have played no serious part in the general result, which was arrived at upon plainly competent testimony to almost precisely the same effect. There is nothing in the point that McClatchy was permitted to express his opinion that the second wheel went with the machine. This testimony was given upon cross-examination, and was irresponsive to a question which was proper upon cross-examination. That question was this: "Do you remember telling him [Hammond] that that was your opinion also?" referring to Hammond's claim that the extra charge was extortionate. The answer was: "I don't remember telling Mr. Hammond directly, but that was my opinion. I had previously expressed my opinion in regard to the second wheel." It will be observed that, even if the question were improper, the answer, so far as it was responsive, was harmless. The witness simply did not remember. All else was irresponsive, and no motion was made to strike it out. The second question asked directly what opinion the witness had expressed to Hammond's inspector,—one Rogers. But this question was only objected to as irrelevant,—an objection which was plainly untenable,—for the opinion which the plaintiff's superintendent expressed to the defendant's inspector upon a disputed question as to the propriety of the charge, while not crucial, was clearly relevant. It was certainly proper to be brought out upon the cross-examination of one who was called in support of the plaintiff's right to make the charge.

The other questions presented are trivial, and call for no special consideration.

The judgment was right, and should be affirmed, with costs. All concur.